# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,

       Plaintiff,

  v.

Aaron Lee Gant,

       Defendant.

**MEMORANDUM OPINION AND ORDER**
Criminal No. 12-61 ADM/TNL

_____

Surya Saxena, Esq., and Carol M. Kayser, Esq., Assistant United States Attorneys, Minneapolis, MN, on behalf of the Government.

Shannon R. Elkins, Esq., and Katherine Menendez, Esq., Assistant Federal Defenders, Minneapolis, MN, on behalf of Defendant Aaron Lee Gant.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Defendant Aaron Lee Gant's ("Gant") Objections [Docket No. 36] to Magistrate Judge Tony N. Leung's May 22, 2012 Report and Recommendation [Docket No. 35] ("R&R"). Judge Leung's R&R recommended denying Gant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 21] and Gant's Pretrial Motion to Suppress Statements, Admissions, and Answers [Docket No. 23]. After a thorough de novo review of the record and for the reasons set forth below, Gant's Objections are overruled and Judge Leung's R&R is adopted.

## II. BACKGROUND

The facts and procedural history of this case are more fully enunciated in Judge Leung's R&R and are incorporated by reference. Accordingly, only an abridged version of the relevant

facts is set forth below.[1]

On December 29, 2011, St. Paul Police Officer Mark Nelson ("Officer Nelson") heard over his radio an officer safety bulletin aired by gang unit Officer Chad Degree ("Officer Degree"). Suppression Hr'g Tr. 26-28, Apr. 23, 2012 [Docket No. 39]. The bulletin stated that an unnamed black male was driving a black Monte Carlo with a specific license plate on the east side of St. Paul, and that he was in possession of a firearm and might be en route to Hastings, Minnesota. Hr'g Tr. 28:18-24. On December 30, 2011, Officer Nelson received more information about the safety bulletin from gang unit Officer Tim Moore. Hr'g Tr. 30-31. Officer Moore stated that he had interviewed someone in Hastings regarding the car's normal driver, and determined that the Monte Carlo's normal driver was a white male involved in the use or sale of methamphetamine. Hr'g Tr. 31. Officer Moore also told Officer Nelson that the source of the original information was reliable, "good info." Hr'g Tr. 31-32.

At approximately 9:00 a.m. on the morning of December 31, 2011, Officer Nelson was on routine patrol in St. Paul when he recognized the Monte Carlo which was the subject of the officer safety bulletin. Hr'g Tr. 35-36. The car was occupied by a black male driver, Gant, and a white male passenger. Hr'g Tr. 33. The Monte Carlo proceeded westbound on Cook Avenue past Officer Nelson's squad car, and Officer Nelson subsequently made a U-turn to follow the car. Hr'g Tr. 37. Officer Nelson radioed other officers to alert them as to his location and the situation, and he stayed on the radio while tailing the car. Hr'g Tr. 36-38, 65. Officer Nelson observed the vehicle speeding and failing to come to a complete stop at a stop sign. Hr'g Tr. 40-

---

[1] The R&R's findings of fact are based on in-court testimony of Sergeant Peterson, Officer Nelson, and Officer Jeff Cragg at the motion hearing on April 23, 2012. See generally Hr'g Tr.

42, 69.

After several blocks, the Monte Carlo pulled into a driveway. Hr'g Tr. 43. Officer Nelson activated his emergency lights and siren and pulled in behind the Monte Carlo. Hr'g Tr. 43; Def. Ex. [Docket No. 28] Nelson Tr. 5, Dec. 31, 2011 ("Nelson Tr."). The driver's door opened, and Officer Nelson told the driver to remain in the vehicle and turn it off. Hr'g Tr. 46; Gov't Ex. 3. Gant then emerged from the car and began to run. Hr'g Tr. 47; Gov't Ex. 3. Officer Nelson pursued Gant on foot. Hr'g Tr. 47; Nelson Tr. 5-6. Officer Nelson spotted a gun in Gant's waistband and yelled for him to drop his gun. Hr'g Tr. 47; Gov't Ex. 3. Officer Nelson ultimately fired four shots at Gant and shouted for backup from the other officers who had arrived on the scene in response to his radio request. Hr'g Tr. 49; Gov't Ex. 3. Gant continued to flee on foot, eventually dropping the gun. Hr'g Tr. 47. Gant was finally apprehended by other officers, and in retracing the path of Gant's flight, Officer Nelson discovered the discarded firearm. Nelson Tr. 6.

Sergeants Jake Peterson and Tom Bergren interviewed Gant around 10:30 that morning at the St. Paul Police Headquarters. Hr'g Tr. 9; Gov't Ex. 1. Gant initialed and signed a Miranda waiver and made several admissions in the resulting questioning. Hr'g Tr. 11-16; Gov't Exs. 1, 2. During the forty-five minute interview, Gant did not request an attorney. Hr'g Tr. 16; Gov't Ex. 1.

At approximately 12:30 that same afternoon, Sergeants Peterson and Bergren interviewed Officer Nelson consistent with St. Paul Police Department's "critical incident" policy. Hr'g Tr. 19-20. Under the policy, whenever a critical incident occurs, such as a police officer firing his weapon, that police officer is interviewed in lieu of preparing a written report. Hr'g Tr. 18-19;

3

Def. Ex. 2. During this interview, Officer Nelson outlined the morning's events and explained why he had fired his weapon. Nelson Tr. 3-8. Officer Nelson stated he had opted not to stop the Monte Carlo until backup officers had arrived out of concern for his own safety, but he did not mention either of Gant's traffic violations. Nelson Tr. 5; Def. Ex. 2.

On January 31, 2012, Officer Degree and Special Agent Erin Dockter of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") spoke with Officer Nelson about the Gant encounter. Hr'g Tr. 60-62. At this interview Officer Nelson first mentioned the speeding and failure to completely stop as the basis for the traffic stop. Hr'g Tr. 61-62.

Gant was indicted on March 5, 2012, for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). See Indictment [Docket No. 6]. On March 26, 2012, Gant filed two suppression motions, and on May 22, 2012, Judge Leung recommended denying those motions in his R&R. Gant now objects and seeks review of the R&R.

### III. DISCUSSION

#### A. Legal Standard

The Fourth Amendment of the United States Constitution safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment, and generally, the police must have probable cause to believe a traffic violation has occurred for the seizure to be reasonable. Whren v. United States, 517 U.S. 806, 809–10 (1996). Even a minor traffic violation provides sufficient probable cause to constitute a reasonable seizure. United States v. Frasher, 632 F.3d 450, 453 (8th Cir. 2011). An officer may be mistaken about whether a traffic violation occurred, as long as the officer's actions and mistake

4

were objectively reasonable given the circumstances. United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005). A traffic stop is objectively reasonable when an officer has probable cause, even if the officer had an ulterior motive and even if the officer would have otherwise ignored the violation but for the ulterior motive. United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009).

B. Analysis

Gant argues that Officer Nelson observed no traffic violations prior to the stop but rather stopped him solely because of Officer Degree's safety bulletin. Gant also contends that an objectively reasonable officer under the same circumstances would not have had probable cause sufficient for an investigatory stop. As a result, Gant posits, the stop was unreasonable, and therefore the gun, his subsequent admissions, and any other evidence should be suppressed as tainted fruit of the unreasonable seizure. Def.'s Mem. in. Supp. [Docket No. 29] 10-18. The Government retorts that a reasonable officer would have had probable cause and that Gant's subsequent flight provided an independent basis for his arrest. Pl.'s Mem. in Opp'n [Docket No. 31] 1.

1. Probable Cause to Stop

Driving over thirty miles per hour in an urban district is illegal in Minnesota. Minn. Stat. § 169.14, subd. 2(1). Moreover, every driver in Minnesota must bring his vehicle to a complete stop at a stop sign. Minn. Stat. § 169.30(b). In the April 23, 2012 hearing before Judge Leung, Officer Nelson explained that while following Gant's vehicle, he witnessed Gant speed and fail to fully stop at a stop sign. Hr'g Tr. 40-42, 69. Officer Nelson explains that he did not mention these traffic stops in his radio plea for officer backup because this was not routine department

5

policy. Hr'g Tr. 38-39. Further, Officer Nelson states that he failed to identify the traffic stops in his "critical incident" interview with Sergeants Peterson and Bergren because that interview was focused on his reason for firing his gun, not his basis for the initial traffic stop. Hr'g Tr. 67-68. Although Officer Nelson may have initially followed the black Monte Carlo because of Officer Degree's safety bulletin, Hr'g Tr. 36-38, his alleged ulterior motives do not alter that he observed two traffic violations which served as probable cause to stop the vehicle. See Arciniega, 569 F.3d at 397 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis . . . . Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant.") (quotations and citations omitted).

While Defendants attempt to cast aspersion on Officer Nelson's credibility — citing his omission of the traffic violations in both his radioed statements and his "critical incident" interview transcript — the record clearly establishes he had probable cause to stop Gant's vehicle. No extrinsic evidence has been offered to contradict Officer Nelson's testimony, and "[t]he mere fact an incident report omits certain details is not sufficient to render the officer's testimony concerning the underlying action facially implausible." United States v. Mendoza, 677 F.3d 822, 828 (8th Cir. 2012).

### 2. Probable Cause to Arrest

A warrantless arrest by a police officer is a reasonable seizure under the Fourth Amendment if probable cause exists to believe a crime has occurred or is afoot. United States v. Jones, 535 F.3d 886, 890 (8th Cir. 2008). Probable cause exists for a warrantless arrest when a reasonable person, given the facts and circumstances, would believe a person had committed or

6

was committing a crime. United States v. Torres-Lona, 491 F.3d 750, 755 (8th Cir. 2007). "Importantly, a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." United States v. Blackmon, 662 F.3d 981, 985–86 (8th Cir. 2011) (quotation omitted); see also United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005) ("In our circuit, resistance to an illegal arrest can furnish grounds for a second, legitimate arrest.").

Although the exclusionary rule prohibits evidence obtained in violation of the Fourth Amendment from being introduced at trial to establish guilt, it does not apply to evidence obtained in connection with a new crime. See, e.g., United States v. Sledge, 460 F.3d 963, 966 (8th Cir. 2006) (affirming that a defendant forfeits any Fourth Amendment protection based on an initially unlawful seizure when that defendant commits a new crime such as obstructing a peace officer by running away). In Minnesota, "[w]hoever, for the purpose of avoiding arrest, detention, or investigation . . . attempts to evade or elude a peace officer, who is acting in the lawful discharge of an official duty, by means of running [or] hiding . . . is guilty of a misdemeanor." Minn. Stat. § 609.487, subd. 6. Where a defendant, like Gant, refuses to obey officer commands and flees, a police officer has probable cause to arrest the defendant for resisting arrest. Blackmon, 662 F.3d at 986. "Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Illinois v. Wardlow, 528 U.S. 119, 124–25 (2000). An officer who sees an individual flee is armed only with his "commonsense judgments and inferences about human behavior," and he is therefore "justified in suspecting that [individual] was involved in criminal activity, and, therefore, in investigating further." Id. at 125. Moreover, "[i]f an officer has

7

probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

Even if the initial traffic stop lacked probable cause, Gant's flight from a police officer and refusal to obey a police officer's directives were sufficient indicia to lead Officer Nelson to reasonably believe that Gant was committing a crime — namely, the misdemeanor of evading a police officer. Because Gant's flight provided Officer Nelson with probable cause that he was committing a crime in his presence, Gant's arrest was proper and the subsequently acquired evidence is admissible.

Gant also argues that he did not voluntarily abandon his gun, and therefore did not forfeit his reasonable expectation of privacy of the firearm. "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997). Gant attempts to distinguish his case, stating that because Officer Nelson shot at him four times, he did not drop the gun voluntarily but rather in response to Officer Nelson's unlawful seizure and show of authority. The Supreme Court rejected this argument in California v. Hodari D., 499 U.S. 621 (1991), holding that a seizure has not occurred when, despite a show or authority or an application of physical force, the subject does not yield. Id. at 625–26. Since Gant clearly kept fleeing Officer Nelson and did not yield, his firearm was not seized by Officer Nelson's show of authority. Gant's gun was voluntarily abandoned and therefore is not excludable on Fourth Amendment grounds, even if this Court had determined that Gant's traffic stop or seizure was unlawful, which it has not.

8

### 3. Miranda Waiver

Gant now argues for the first time in his Objections that his statements to Sergeants Peterson and Bergren should be suppressed because the prior Fourth Amendment violations made his arrest unconstitutional. Gant cites numerous cases for the proposition that a confession made through custodial interrogation after an illegal arrest, without intervening events to break the causal connection between the arrest and confession, is not "sufficiently an act of free will to purge the primary taint." Brown v. Illinois, 422 U.S. 590, 602 (1975) (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)); see also Taylor v. Alabama, 457 U.S. 687 (1982) (same). As this Court has noted, Gant's arrest was lawful, so his statements will not be suppressed on this basis.

Furthermore, Gant's statements pass muster with the Fifth and Sixth Amendment, because the totality of the circumstances indicate he made them knowingly, voluntarily, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Sergeant Peterson read Gant his rights, Gant initialed after each right, and Gant signed the form to acknowledge that he understood his rights. Hr'g Tr. 11-16; Gov't Exs. 1, 2. Accordingly, this Court concludes he waived his rights knowingly, voluntarily, and intentionally, and his statements will not be suppressed.

### IV. ORDER

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Gant's Objections [Docket No. 36] are **OVERRULED**;

2. Judge Leung's Report and Recommendation [Docket No. 35] is **ADOPTED**;

3. Defendant Gant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 21] is **DENIED**; and

4. Defendant Gant's Pretrial Motion to Suppress Statements, Admissions, and Answers [Docket No. 23] is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: June 7, 2012.